PAUL B. BEACH, State Bar No. 166265
DENNIS M. GONZALES, State Bar No. 59414
RAYMOND W. SAKAI, State Bar No. 193507
rsakai@lbaclaw.com
EMILY B. SUHR, State Bat No. 306658
esuhr@lbaclaw.com
LAWRENCE BEACH ALLEN & CHOI, PC
100 West Broadway, Suite 1200
Glendale, California  91210-1219
Telephone No. (818) 545-1925
Facsimile No. (818) 545-1937

Attorneys for Defendant
COUNTY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALD SAKAMOTO, *by and throug* *Surviving heirs*; JANE MARIKO SAKAMOTO, an individual; MINDY TSUYORI SAKAMOTO BRINK, an individual; JASON KIYOSHI SAKAMOTO, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF LOS ANGELES; CITY OF LOS ANGELES; CITY OF PASADENA; STATE OF CALIFORNIA; and DOES 1 - 65,<br><br>Defendants. | Case No. 2:17-cv-03181 R (ASx)<br><br>The Honorable Manuel L. Real<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>*[Declarations and Exhibits; Statement of Uncontroverted Material Facts; and [Proposed] Judgment Filed Concurrent Herewith]*<br><br>Date:  February 5, 2018<br>Time:  10:00 a.m.<br>Crtrm:  880 |

///

///

1        TO THE HONORABLE COURT, ALL INTERESTED PARTIES, AND TO
2   THEIR ATTORNEYS OF RECORD:
3        PLEASE TAKE NOTICE THAT on February 5, at 10 a.m., or as soon
4   thereafter as the matter may be heard, in Courtroom 880 of the above-referenced
5   Court, located at the Roybal Federal building and U.S. Courthouse, 255 East
6   Temple Street, Los Angeles, CA 90012, Defendant County of Los Angeles, under
7   Federal Rules of Civil Procedure Rule to Fed. R. Civ. P. 56, will and hereby does
8   move this Court for an order granting summary judgment in Defendant's favor,
9   against all Plaintiffs as to all claims for relief on the basis that there is no genuine
10  dispute as to any material fact alleged by Plaintiffs and Defendant is entitled to
11  judgment as a matter of law.
12       This Motion on made on the grounds that Defendant did not cause any
13  constitutional violation in this matter and does not maintain the policies, customs,
14  or practices that Plaintiffs allege caused a violation of Decedent's right.
15       This Motion is based on this notice, the attached Memorandum of Points and
16  Authorities, the Statement of Uncontroverted Facts and Conclusions of Law, the
17  Declarations of Deputy Ralph Feroli, Cornelia Lindo, Robbin Velasco, Dr.
18  Nickolay Teophilov, Captain Elier Morejon, and Emily B. Suhr filed concurrently
19  herewith with, exhibits attached thereto, all pleadings and records on file in this
20  action, and on such further authority, evidence, or argument as may be presented at
21  or before the time of any hearing on this Motion.
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

2

1       This Motion is made following the conference of counsel under Local Rule

2   7-3 that took place between December 18, 2017 and December 29, 2017, over

3   seven days prior to filing this motion.

4

5   Dated:  January 8, 2018                LAWRENCE BEACH ALLEN & CHOI, PC

6

7                                          By ____/s/ Emily B. Suhr_____

8                                             Emily B. Suhr
                                              Attorneys for Defendant
9                                             County of Los Angeles

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAKAMOTO\Motion for Summary Judgment

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................1

I.     INTRODUCTION ..........................................................................................1

II.    FACTUAL BACKGROUND ........................................................................2

    A.    On July 29, 2016, After Causing An Accident By Driving The Wrong Way On Various Freeways, Decedent Was Arrested For Driving Under The Influence By California Highway Patrol ........................................................................................................2

    B.    During Booking And Processing Through LASD's Inmate Reception Center, Decedent Was Assessed For Physical And Mental Health Issues Before Being Released ....................................4

        i.    No Mental Or Physical Health Problems Were Indicated During The Initial Intake Screening By A RN ........................5

        ii.    Decedent Passed Further Evaluation By A RN In The IRC Clinic For Mental And Physical Health Problems ..........6

        iii.    On July 29, 2016, At Approximately 7:47 p.m., As Decedent Displayed No Signs Of Mental Or Physical Health Problems And Waived His Right To Remain In Custody Until The Next Morning, He Was Released From Custody ........................................................................7

    C.    Jane Sakamoto Did Not Inform IRC That She Had Any Concerns   About Decedent's Physical Or Mental Wellbeing Prior To His   Release ............................................................8

    D.    The Publics' Medical And Mental Health Concerns About Inmates Are Coordinated Through The LASD's Medical Command Center ..............................................................................10

III.    PROCEDURAL HISTORY AND REMAINING CAUSES OF ACTION ......................................................................................................11

IV.    LEGAL STANDARD ................................................................................13

V.    DEFENDANT COUNTY IS ENTITLED TO SUMMARY JUDGMENT  BECAUSE THERE IS NO GENUINE DISPUTE AS TO ANY  MATERIAL FACT AS TO ANY ALLEGED CONSTITUTIONAL  VIOLATION ..................................................13

    A.    Plaintiffs Cannot Prevail On Their Claims Because Defendant Had No Duty To Protect Decedent After His Release   From Custody ................................................................15

        i.    The special relationship exception does not apply as Decedent was not in Defendant County's custody when he   died ..................................................................................16

ii. The state-created danger exception does not spply because Defendant County had no notice or knowledge that releasing Decedent could cause him harm ..................................................... 17

VI. DEFENDANT COUNTY DID NOT HAVE A CUSTOM, POLICY, OR PRACTICE THAT CAUSED ANY ALLEGED VIOLATION OF DECEDENT'S RIGHTS ........................................ 19

A. LASD Has Policies And Protocols In Place To Ensure Information About An Inmate's Physical Health, Mental Health, And/Or Need For Medication Is Received, Addressed, And Relayed To Healthcare Personnel In The Facility Where An Inmate Is Housed ............................... 20

B. LASD Has Customs And Policies In Place To Ensure All Custody Personnel Are Extensively Trained In The Evaluation, Recognition, And Intervention Of Inmates With Mental Health Problems ................................... 21

C. Defendant Does Not Have A Pattern And Practice Of Releasing Mentally Ill Inmates Without Regard To Their Wellbeing And Safety ................................ 24

VII. CONCLUSION ............................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

1

**<u>TABLE OF AUTHORITIES</u>**

2

<u>CASES</u>

3

4

<u>Anderson v. Liberty Lobby, Inc.</u>,

5

 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ................................... 13

6

<u>Campbell v. State of Washington Dep't of Soc. & Health Servs.</u>,

7

 671 F.3d 837 (9th Cir. 2011) ............................................................................... 17

8

<u>Castro v. Cty. of Los Angeles</u>,

9

 833 F.3d 1060 (9th Cir. 2016) ....................................................................... 18, 19

10

<u>Celotex Corp. v. Catrett</u>,

11

 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ................................... 12

12

<u>City of Canton, Ohio v. Harris</u>,

13

 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) ................................. 13

14

<u>City of Los Angeles v. Heller</u>,

15

 475 U.S. 796, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) ................................... 13

16

<u>Cutlip v. City of Toledo</u>,

17

 488 F. App'x 107 (6th Cir. 2012) ....................................................................... 16

18

<u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>,

19

 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) ............................ 15, 16

20

<u>Kennedy v. City of Ridgefield</u>,

21

 439 F.3d 1055 (9th Cir. 2006) ............................................................................ 16

22

<u>L.W. v. Grubbs</u>,

23

 92 F.3d 894 (9th Cir. 1996) ................................................................................ 17

24

<u>Lewis v. Cty. of San Bernardino</u>,

25

 No. EDCV 11-01594 VAP, 2011 WL 6288100 (C.D. Cal. Dec. 14, 2011) 16, 17

26

<u>Monell v. Dep't of Soc. Servs. of City of New York</u>,

27

 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) ............................... 11, 13

28

iii

Patel v. Kent Sch. Dist.,

   648 F.3d 965 (9th Cir. 2011)........................................................................16, 17

Quintanilla v. City of Downey,

   84 F.3d 353 (9th Cir. 1996)...............................................................................13

Trevino v. Gates,

   99 F.3d 911 (9th Cir. 1996)....................................................................14, 19, 24

**<u>STATUTES</u>**

42 U.S.C.A. § 1983 (West)..............................................................................passim

**<u>RULES</u>**

Fed. R. Civ. P. 41(a)(1)(A)(ii) ...........................................................................12

Fed. R. Civ. P. 56............................................................................................2

Fed. R. Civ. P. 56(a) .......................................................................................12, 13

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On July 29, 2016, after causing a traffic accident by driving the wrong way on several freeways, Decedent Gerald Sakamoto ("Decedent") was arrested by the California Highway Patrol and booked into the custody of the Los Angeles County Sheriff's Department ("LASD"). Following LASD policies and practices, healthcare personnel conducted two separate evaluations of Decedent to assess him for physical and mental health issues. Decedent denied any mental health issues and displayed no signs or symptoms of any type of mental or neurological impairment while in LASD custody. While Decedent was in LASD custody, Decedent's wife Jane Sakamoto called the LASD for basic information about Decedent's incarceration, but never alerted the LASD of any concerns about Decedent's mental health. On July 29, 2016, at approximately 7:46 p.m., about twelve hours after being booked into the LASD custody, Decedent was released with a misdemeanor citation after waiving the option to remain in custody until the next morning. Subsequently, Decedent went missing. Three days later, Decedent's body was located at a nearby Los Angeles City maintenance yard, which was not owned or operated by Defendant Los Angeles County ("Defendant County").

Plaintiffs, Estate of Gerald Sakamoto, Jane Mariko Sakamoto, Mindy Tsuyori Sakamoto Brink, and Jason Kiyoshi Sakamoto (collectively "Plaintiffs"), claim causes of action against Defendant under 42 U.S.C.A. § 1983 (West), alleging Defendant County acted with deliberate indifference when they released Decedent after Defendant County was on notice that Decedent had mental health issues and could not be released without a family member or guardian present. Plaintiffs further allege that Defendant County has customs and policies preventing members of the public from transmitting medical information about an inmate to LASD jail facilities in deliberate indifference to identifying and providing care for inmates

1

with mental health issues.

Plaintiffs cannot prevail on these claims because there is insufficient relevant evidence that (1) Defendant County violated Decedent's constitutional rights, or (2) to support Plaintiffs' claims under *Monell* [1].  As for *Monell*, contrary to Plaintiffs' assertions, the LASD has comprehensive policies and practices for transmitting medical information relating to inmates to the facility where the inmate is located, as well as policies and practices to ensure identification and intervention of inmates with mental health issues.

Accordingly, summary judgment is appropriate here because there is no genuine dispute as any material fact, all of which indicate Defendant is entitled to judgment in its favor as a matter of law.

## II.   FACTUAL BACKGROUND

### A.   On July 29, 2016, After Causing An Accident By Driving The Wrong Way On Various Freeways, Decedent Was Arrested For Driving Under The Influence By California Highway Patrol.

Sometime between the hours of 11 p.m. on July 28, 2016, and 12 a.m. on July 29, 2016, Decedent left his residence in Pasadena, entered his car, and drove away from his home without telling his wife, Plaintiff Jane Sakamoto ("Jane"). Defendant's Statement of Uncontroverted Facts and Conclusions of Law ("SUF") 1. A short time later, driving at a high rate of speed in the wrong way on Interstate 5 ("I-5") – traveling northbound in the southbound side – Decedent headed into a construction closure zone where construction workers were present.  SUF 2.  Two California Highway Patrol ("CHP") officers, Officer Angel Juarez and Officer Ricky Lee, were in their illuminated marked patrol vehicle inside the construction closure zone to monitor traffic, deter vehicles from illegally entering the construction closure, and provide security and ensure the safety of the construction workers, as well as members of the public using that portion of the freeway.  SUF

---

[1] Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

2-4.

Decedent accelerated directly toward the front of the CHP vehicle, causing the officers to fear for their lives and the lives of the construction workers.  SUF 5-6.  Decedent's vehicle narrowly missed a collision with the CHP officers' patrol vehicle and continued driving past their vehicle continuing traveling the wrong direction on the freeway.  SUF 7-8.  The CHP officers activated their lights and sirens and pursued Decedent, who left the construction closure and continued into lanes of southbound traffic still driving northbound.  SUF 7-8.  Other vehicles, including a big rig, were required to take evasive maneuvers to avoid Decedent. SUF 7-8.  Decedent eventually stopped when the lane he was driving in ended.  SUF 9.

The CHP officers conducted a felony stop, where Decedent was ordered to exit the vehicle, walk toward the officers, and place his hands behind his head to be handcuffed.  SUF 10.  Decedent was then handcuffed and placed in the rear of the CHP officers' patrol vehicle.  SUF 10.  Throughout the felony stop, Decedent did not display any signs indicating he was a danger to himself or others, nor did he display signs of confusion or disorientation.  SUF 10.  Rather, he appeared to understand each order and was cooperative and compliant with all instruction.  SUF 10.

After detaining Decedent, CHP Officers Juarez and Lee were notified that Decedent had caused an accident prior to their interaction with him.  SUF 11.  They transported Decedent to the scene of the accident and left him in the custody of CHP Officer C. Sanchez.  SUF 12.  CHP Officer Juarez then called Jane at her home, between 2 and 3 a.m., to inform her that Decedent had been detained.  SUF 13.  CHP Officer Juarez explained the circumstances of Decedent's detention and asked Jane if Decedent had any medical conditions or if he was taking any medication.  SUF 13-16.  Jane answered "no" to both questions.  SUF 15-16. During this phone call, Jane never mentioned any concerns about Decedent's ability

3

to care for himself.  SUF 15-17.

CHP Officer Sanchez conducted an investigation and determined Decedent was driving northbound in the southbound lanes of I-5 prior to his detention by CHP Officers Lee and Juarez.  SUF 18.  A collision occurred when a driver driving southbound took evasive action to avoid Decedent and crashed into the center divider, causing injuries to the driver.  SUF 18.  CHP Officer Sanchez conducted a series of Field Sobriety Tests, which Decedent failed.  SUF 19.  Decedent admitted to CHP Officer Sanchez that he had taken Ativan and Ambien prior to driving his vehicle.  SUF 20.  Based on his observations that were consistent with drug intoxication, at approximately 3:08 a.m. on July 29, 2016, CHP Officer Sanchez arrested Decedent on a misdemeanor violation of Vehicle Code 23152 (e) Driving While Under the influence of Drugs.  SUF 20-21.  He then transferred Decedent to LASD's Inmate Reception Center ("IRC") for booking.  SUF 22.

**B.** **During Booking And Processing Through LASD's Inmate Reception Center, Decedent Was Assessed For Physical And Mental Health Issues Before Being Released.**

IRC processes approximately 120,000 inmates into and out of the LASD jail system each year.  SUF 142.  It is the transfer and pickup point for inter-facility transfers, custody transfers and custody releases to the state prison system, Homeland Security, and other governmental agencies.  SUF 142.  IRC is responsible for the booking and release of all male prisoners in and out of Los Angeles County custody facilities, as well as interviewing, classifying, and placing inmates at various facilities according to security and institutional needs.  SUF 142.

On July 29, 2016, prior to booking Decedent in IRC, CHP Officer Sanchez filled out booking paperwork for Decedent, including the "Arrestee Medical Screening Form."  SUF 23, 135.  The Form, which was provided to IRC at the time of booking, indicated that Decedent had no medical or mental health conditions and was not taking medication.  SUF 23-34.

At approximately 7:25 a.m., CHP Officer Sanchez escorted Decedent in

4

handcuffs to the Booking Front area of IRC where he was met by an LASD deputy sheriff and a nurse.  SUF 24.  He gave the nurse the Arrestee Medical Screening Form and then departed after the deputy returned his handcuffs.  SUF 24.  For the next hour, Decedent followed instructions and went through the booking process without issue.  SUF 24-28.

### i.  No Mental Or Physical Health Problems Were Indicated During The Initial Intake Screening By A RN.

Per policy, all newly booked inmates at IRC, like Decedent, are screened for physical and/or mental health issues prior to being housed in a Los Angeles County jail facility, including IRC.  SUF 41, 135-139.  At approximately 8:25 a.m., a registered nurse, David E. Jung ("Nurse Jung"), conducted Decedent's intake screening.  SUF 28-31.  Healthcare personnel working in IRC are trained to assess inmates' mental health through interview and observation during an evaluation.  SUF 134, 137.  For example, intake screening involves reviewing the Arrestee Medical Screening Form and asking the inmate a series of questions related to physical and mental health.  SUF 42, 135.  If an inmate answers "yes" to any of the intake questions, he is referred to the IRC Clinic for further evaluation and database entry (i.e., evaluation), by a registered nurse.  SUF 42, 136.  If an inmate is over 55 years old, he is referred for this second evaluation and database entry regardless of the answers provided.  SUF 42, 136.

Here, Decedent answered "yes" to having medical problems and currently taking medication.  He answered "no" to current medical problems, history of mental illness, and current mental health problems.  SUF 29.  Nurse Jung indicated that Decedent displayed no signs of bizarre behavior or mental illness.  SUF 29.  Nurse Jung also noted Decedent's blood pressure, hypertension, and that he was over the age of 55.  SUF 29.  Accordingly, he issued Decedent an orange wrist band to indicate he required further evaluation and referred Decedent to the IRC Clinic for further evaluation and database entry.  SUF 30.  Following his intake screening, Decedent helped himself to a lunch and juice in the Booking Front area.  SUF 31.

In the following hours, Decedent navigated the Booking Front area and adjacent unsecure waiting cells without assistance.  SUF 32.  At approximately 11:19 a.m., Decedent helped himself to another lunch and juice from a container in Booking Front.  SUF 32.  A few minutes later, Decedent changed from his civilian attire into a jail uniform without assistance.  SUF 33.  At approximately 11:32 a.m., Decedent was escorted to the IRC Clinic. SUF 34-36.

      ii.      **Decedent Passed Further Evaluation By A RN In The IRC Clinic For Mental And Physical Health Problems.**

Decedent drank his juice and sat in a chair in the back of the IRC Clinic waiting room until a nurse called his name at approximately 12:12 p.m.  SUF 36-37.  Decedent followed her directions to a screening area.  SUF 37.  Cornelia Lindo, a registered nurse ("Nurse Lindo"), conducted Decedent's second evaluation and database entry.  SUF 38.  Per policy, Nurse Lindo first reviewed Decedent's Electronic Medical Record ("EMR"), which was generated at IRC and contained the Arrestee Medical Screening Form from CHP Officer Sanchez and Nurse Jung's Intake Screening.  SUF 43.  She did not have access to any outside medical records. SUF 49.

Nurse Lindo has been a registered nurse for over 30 years and screened over 98,800 patients for medical and/or mental health issues in her 19 years with Los Angeles County.  SUF 39.  She asked Decedent questions regarding his medical and mental health and assessed him for potential medical and mental health issues.  SUF 44.  During the assessment, Decedent was talkative, calm, and friendly.  SUF 44.  He exhibited no signs and gave no indicators of confusion, dementia, or any other ailments that would affect his reasoning and/or memory processes.  SUF 45.  Nurse Lindo asked Decedent specific questions designed to detect mental health or neurological impairments, such as orientation to time and place.  SUF 46.  He appeared to understand her questions and answered appropriately.  SUF 46.  Decedent denied both any history of mental illness and whether he was experiencing any symptoms at the time.  SUF 46.  Additionally, Decedent did not

6

display any objective signs of mental illness.  SUF 47.  To the contrary, he appeared to Nurse Lindo to be a pleasant, intelligent, capable person.  SUF 47.  From his behavior and demeanor, she thought he might be a business man.  SUF 47.

Had Decedent displayed any signs or symptoms of a medical and/or mental health issue or requested to see a healthcare provider, Nurse Lindo would have noted it in his EMR and referred him to an appropriate medical or mental health care provider, as required by policy.  SUF 51-52.  Because he did not, Nurse Lindo referred Decedent to be released from custody without further evaluation by a provider.  SUF 50.

        **iii.**     **On July 29, 2016, At Approximately 7:47 p.m., As Decedent Displayed No Signs Of Mental Or Physical Health Problems And Waived His Right To Remain In Custody Until The Next Morning, He Was Released From Custody.**

At approximately 12:31 p.m., Decedent left the IRC Clinic and walked to a release cell where a deputy checked his paperwork and directed him inside a cell.  SUF 53-54.  Decedent remained in the cell where he was provided dinner and civilian attire.  SUF 55.  At approximately 7:29 p.m., Decedent was directed out of the release cell to the Release Slide area of IRC by a deputy.  SUF 56.

At 7:40 p.m., a deputy presented Decedent with a Voluntary Delayed Release form.  SUF 57.  Per Penal Code § 4024, LASD maintains a Voluntary Delayed Release program, which provides released inmates the opportunity to stay in custody up to 16 additional hours or until normal business hours if they so choose.  SUF 152.  Per policy, an inmate can choose to stay in custody for a number of reasons, including not wanting to be released during nighttime hours and not having transportation available.  SUF 152.  Prior to release, each inmate at IRC is presented with a Voluntary Delayed Release form and provided an explanation by a deputy of the option to stay.  SUF 152.  Decedent signed the Voluntary Delayed Release form indicating he did not want to remain in custody.  SUF 57.  The deputy provided

1    Decedent with a citation for the misdemeanor charge.  SUF 57.

2    At approximately 7:45 p.m., Decedent was directed to a cashier where he

3    collected his property.  SUF 58.  Two prominently displayed signs in the area

4    advise inmates that they can request a free token from the cashier for a bus ride.

5    SUF 153.  The public waiting area, just outside the release waiting area contains a

6    bank of four payphones that can be used by members of the public, including

7    inmates just released.  SUF 153.

8    At 7:47 p.m., Decedent exited IRC onto Bauchet Street and out of LASD's

9    custody.  SUF 59-60.  While in IRC, Decedent did not display any behaviors

10   indicative of mental illness or mental health distress.  Rather, Decedent appeared

11   cooperative and to understand and follow all instructions given by IRC staff.  SUF

12   61.

13   On August 1, 2016, three days later, Decedent's body was found at the Los

14   Angeles City Maintenance Center, located at 555 Ramirez Street, Los Angeles, CA,

15   90012.  SUF 62-63.  The maintenance yard is not owned or operated by Los

16   Angeles County.  SUF 63-64.  The Coroner determined August 1, 2016 was the

17   date of death, the manner of death was by accident and the cause of death was

18   environmental heat and sun exposure, with contributing conditions including

19   arteriosclerotic cardiovascular disease.,.  SUF 62, 67.  There was no pathologic

20   evidence Decedent had Alzheimer's disease.  SUF 66.

21   **C.    Jane Sakamoto Did Not Inform IRC That She Had Any Concerns**
22   **About Decedent's Physical Or Mental Wellbeing Prior To His**
     **Release.**

23   To assist members of the public with obtaining or conveying information

24   about an inmate in any Los Angeles County jail facility, LASD has a call center

25   known as the Inmate Answering Service or Information Answering Service

26   ("IAS"), which is located in IRC that operates 24 hours a day, seven days a week.

27   SUF 71, 102.   It is staffed by both inmate workers, who serve as telephone

28   operators ("IAS operators"), and custody assistants and/or deputies, who supervise

8

the IAS operators ("IAS supervisors").  SUF 102.  IAS' phone number, 213-473-6100, is prominently displayed on the LASD's website for IRC inmate information.  SUF 112.  All telephone calls to IAS are recorded.  SUF 72, 111.

Jane made a total of three phone calls to IAS on July 29, 2016, regarding Decedent.  SUF 73, 78.  Only the first call was received prior to Decedent's release.  SUF 78-82, 99, 101.  The latter two calls occurred at 9:16 p.m. and 9:33 p.m. respectively.  SUF 99-101.  In those latter calls, Jane was informed that Decedent had already been released and was no longer in the custody of LASD.  SUF 99-101.

At 11:43 a.m., Jane placed the first call to IAS.  This was the only call Jane made while Decedent was in LASD custody.  SUF 79.  IAS Operator Melvalisa Rodell ("Operator Rodell") answered the call.  SUF 79.  Jane told Operator Rodell that a CHP officer called her at 2 a.m. that morning and told her Decedent had been in an accident, his car was in a ditch, and that he had been driving the wrong way on the freeway.  SUF 80.  Operator Rodell placed Jane on a brief hold and asked her supervisor only whether Decedent would be released with a citation or would need to be bailed out.  SUF 81.  At approximately 11:45 a.m., Operator Rodell took Jane off hold and informed her that Decedent would get a citation and be released in six to eight hours at 450 Bauchet Street.  SUF 82.

Operator Rodell further informed Jane that Decedent could not contact Jane until after he was released and that Decedent would have to try to call her after being released.  Operator Rodell informed Jane that Decedent would be medically and mentally cleared before his release, and provided Jane with the date, time, and address for Decedent's October 2016 court appearance date.  SUF 84-85.  When Operator Rodell informed Jane that Decedent had been arrested for driving under the influence of alcohol or drugs by the CHP Verdugo Hills Station, Jane remarked that "he must have been out of it because we don't usually go that way."  SUF 86-87.  She then thanked Operator Rodell and hung up.  SUF 87.

At no point in the phone call did Jane indicate that Decedent needed

9

medication, suffered from any physical or mental health issues, had dementia and/or was undergoing evaluation for Alzheimer's, or that a family member or guardian needed to be present when Decedent was released.  SUF 88-91.  Jane did not say Decedent had not taken his medication the night prior and that he urgently needed to take it or he could die, nor did she say that Decedent needed a guardian or was incapable of caring for himself.  SUF 92-94.  Throughout the phone call, Jane never asked to speak to medical personnel, nor did she give any indication that she had any concerns about Decedent's physical or mental wellbeing.  SUF 79-94. Additionally, Operator Rodell never told Jane that Jane would be contacted by LASD prior to Decedent's release.  SUF 95.

As Operator Rodell testified at her deposition, had Jane told her that Decedent had mental health issues and/or needed medication, she would have given Jane the phone number to the Medical Command Center ("MCC"), as she has done for other members of the public countless times in the past.  SUF 96-98, 122.

**D.** **The Publics' Medical And Mental Health Concerns About Inmates Are Coordinated Through The LASD's Medical Command Center.**

The MCC provides a means for members of the public to convey medical and/or mental concerns about a loved one in LASD custody and/or ensure an inmate receives their home medication(s).  SUF 124-125.  It is staffed by a minimum of two supervising registered nurses ("MCC Nurses") 24 hours a day, seven days a week.  SUF 125-127.  Per policy, the MCC Nurses act as liaisons and resources between medical staff for patient referrals, or other units with concerns related to inmate medical care.  SUF 128.  They also receive and respond to outside calls from inmates' families, outside providers, and/or court personnel regarding issues related to the inmate's healthcare, refer callers to appropriate unit/clinic, and conduct follow up to ensure timely care.  SUF 128.

MCC Nurses are able to access inmate medical records, assess a caller's

10

concern, and convey the caller's concern or medication information to the healthcare personnel in the facility where the inmate is housed to ensure the inmate is evaluated, treated, and/or receives his medication.  SUF 129.

In addition to speaking with MCC Nurses, members of the public can also provide medical/mental health and/or medication information without calling MCC by faxing the information to the MCC.  SUF 130.  To assist in this process, LASD has forms available in both English and Spanish on the LASD website that family members can fill out and fax to the MCC.  SUF 130.  The forms are not required; a family member may submit the information in any format to the MCC via fax and obtain the same result.  SUF 130.  LASD publishes a detailed guide on its website, which includes step-by-step instructions, pertinent phone and fax numbers, and the medication forms.  SUF 131.

The phone number and fax number for MCC are also provided to IAS operators, who are trained and instructed to provide the numbers to callers who call with concerns about an inmate's physical and/or mental health and/or need for medication.  SUF 97-98, 118-122.  IAS Operators are not discouraged from giving this information out, rather it is LASD policy that they do so.  SUF 119-122.  As such, had Jane conveyed any concern about Decedent's physical or mental well-being to any IAS operator, she would have been provided a means to transmit her concerns directly to a MCC Nurse who could immediately address any issue prior to Decedent being released.  SUF 119, 132.

## III.   PROCEDURAL HISTORY AND REMAINING CAUSES OF ACTION.

On February 15, 2017, Plaintiffs filed a complaint for damages ("Complaint") against the County of Los Angeles ("Defendant County"), City of Los Angeles, City of Pasadena, State of California, and Does 1-65, alleging five causes of action as follows: (1) Violation of Civil Rights under 42 U.S.C.A. § 1983 for violations of Plaintiffs' First, Fourth, and Fourteenth Amendment rights against

11

Defendant County and Doe defendants; (2) Violation of Civil Rights under *Monell*[2] against Defendant County; (3) Violation of Civil Rights under 42 U.S.C.A. § 1983 for deprivation of rights of Plaintiffs to a familial relationship with Decedent under the First and Fourteenth Amendments against Defendant County and Doe defendants; (4) Violation of Civil Code § 52.1 against Defendant County and City of Los Angeles; and (5) Negligence—Wrongful death against all Defendants.

On April 25, 2017, the Court dismissed the City Los Angeles (Dkt. 1-3), on May 18, 2017, the City of Pasadena (Dkt. 15), and on July 27, 2017, the State of California (Dkt. 27).

Defendant County is the sole remaining defendant.  On September 27, 2017, under a stipulation between the Parties, the Court ordered dismissal of the following: (1) Plaintiffs' Claim 1, Violation of Civil Rights – 42 U.S.C.A. § 1983, based on the First and Fourth Amendment of the United States Constitution (Plaintiffs' Claim 1 based on the 14th Amendment remains); (2) Plaintiffs' Claim 3, Violation of Civil Rights – Familial Relationship, based on the First Amendment (Plaintiffs' Claim 3 based on the 14th Amendment remains); and (3) Plaintiffs' Claim 4, Violation of Civil Code § 52.1. Dkt. 34.

On November 29, 2017, this Court granted Defendant County's Motion for Partial Judgment on the Pleadings, which effectively dismissed Plaintiff's Fifth Claim for Negligence—Wrongful death. Dkt. 37.

Only the following claims remain against Defendant County:

(1) Violation of Civil Rights under 42 U.S.C.A. § 1983 for violations of Plaintiffs' 14th Amendment rights;

(2) Violation of Civil Rights under *Monell*; and

(3) Violation of Civil Rights under 42 U.S.C.A. § 1983 for deprivation of rights of Plaintiffs to a familial relationship with Decedent under the 14th

---

[2] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

1    Amendment.

2    **IV.    LEGAL STANDARD**

3    Summary judgment is appropriate where "there is no genuine issue as to any

4    material fact and the moving party is entitled to a judgment as a matter of law."

5    Fed. R. Civ. P. 56(a).  The moving party discharges its initial burden by showing

6    "that there is an absence of evidence to support the nonmoving party's case."  *See*

7    Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265

8    (1986).  Thereafter, the burden shifts to the nonmoving party to designate specific

9    facts showing there is a genuine issue for trial on those claims for which the

10   opposing party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477

11   U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  This means the

12   nonmoving party must provide facts that provide sufficient evidence "for a jury to

13   return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

14   249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "If the evidence is merely colorable,

15   or is not significantly probative, summary judgment may be granted." Anderson v.

16   Liberty Lobby, Inc., 477 U.S. 242, 249–250, 106 S. Ct. 2505, 91 L. Ed. 2d 202

17   (1986) (1986).

18   If summary judgment is not granted on the entire action, a court may render

19   partial summary judgment on individual issues as to which there remains no

20   genuine issue of material fact.  Fed. R. Civ. P. 56(a).

21   **V.    DEFENDANT COUNTY IS ENTITLED TO SUMMARY JUDGMENT**

22   **BECAUSE THERE IS NO GENUINE DISPUTE AS TO ANY**

23   **MATERIAL FACT AS TO ANY ALLEGED CONSTITUTIONAL**

24   **VIOLATION.**

25   A municipality can only be found liable under 42 U.S.C.A. § 1983 where the

26   municipality itself causes a constitutional violation.  Monell v. Dep't of Soc. Servs.

27   of City of New York, 436 U.S. 658, 660–692, 98 S. Ct. 2018, 56 L. Ed. 2d 611

28   (1978); City of Canton, Ohio v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L.

13

Ed. 2d 412 (1989).  Where there is no underlying constitutional violation, there cannot be municipal liability.  "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."  City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) (Emphasis in original); *See also* Quintanilla v. City of Downey, 84 F.3d 353, 355 (9th Cir. 1996) (Rejecting Plaintiff's argument that he should not be required to show that the individual police officers violated his constitutional rights before proceeding on the theory that the Chief and city maintained a policy that resulted in the constitutional violation of other individuals' rights and holding, "an individual may recover under 42 U.S.C.A. § 1983 only when his federal rights have been violated.").

> "As a prerequisite to establishing 42 U.S.C.A. § 1983 municipal liability, the plaintiff must satisfy one of three conditions:  First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. Whether a particular official has final policy-making authority is a question of state law. Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it."

Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996), holding modified by Navarro v. Block, 250 F.3d 729 (9th Cir. 2001).)

Here, Plaintiffs have not named any individual defendants whose conduct might fall into one of these circumstances.  Rather, they make broad allegations that

Defendant County's policies and customs caused Decedent's death without identifying the underlying constitutional violation.  Plaintiffs cannot prevail on their claims because there is no underlying constitutional violation.

### A.   Plaintiffs Cannot Prevail On Their Claims Because Defendant Had No Duty To Protect Decedent After His Release From Custody.

Plaintiffs allege Decedent had a 14th Amendment right to be protected while in custody and a right to be free from affirmative state conduct that put him in danger.  Comp. ¶ 54.  They allege that Defendant violated that right and caused Decedent's death by (1) releasing Decedent alone at night without required medication and without notifying his family, despite being on notice of the foreseeable harm this would cause and assurances to the family they would be contacted upon his release, and (2) acting deliberately indifferent to Decedent's physical security.  *Id.*

Plaintiffs cannot prevail in this claim because Decedent was not in custody at the time of his death and, as explained below, the State-Created Danger exception does not apply.

In <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 197, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989), the U.S. Supreme Court held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."

> "[N]othing in the language of the [14th Amendment's] Due Process Clause itself requires the State[3] to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.  It forbids the State itself to deprive

---

[3] As used here, the term "State" refers generically to state and local government entities and their agents.  <u>DeShaney</u>, 489 U.S. at 195.

individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means."

DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989).

In *DeShaney*, plaintiffs filed a § 1983 claim against the county alleging a violation of the 14th Amendment's Due Process Clause for failing to protect a minor child from his father, who beat him to the point of permanent brain damage. *Id*. at 193. Plaintiffs argued that, even though the father was not a state actor, the county had an affirmative duty to protect the child because social workers knew of the dangers posed to him and undertook to protect him, thus creating a special relationship. *Id*. at 197. The Court rejected this argument:

"While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua"

*Id*. at 201.

### i. The special relationship exception does not apply as Decedent was not in Defendant County's custody when he died.

*DeShaney* set the general rule that the government owes no due process duty to protect an individual from private action. Two exceptions to this rule have

16

emerged.  First, the special relationship exception applies when "a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiff's safety and well-being." <u>Kennedy v. City of Ridgefield</u>, 439 F.3d 1055, 1061 (9th Cir. 2006).  "A special relationship exists when the state acts to 'restrain an individual's freedom to act on his own behalf, [either] through incarceration, institutionalization, or other similar restraint of personal liberty.' [Citation.] 'The special-relationship exception does not apply[, however,] when a state fails to protect a person who is not in custody.' [Citation.]." <u>Lewis v. Cty. of San Bernardino</u>, No. EDCV 11-01594 VAP, 2011 WL 6288100, at *4 (C.D. Cal. Dec. 14, 2011), <u>aff'd</u>, 558 F. App'x 735 (9th Cir. 2014).  *See also* <u>Patel v. Kent Sch. Dist.</u>, 648 F.3d 965, 972 (9th Cir. 2011) ("The special-relationship exception does not apply when a state fails to protect a person who is not in custody."); <u>Cutlip v. City of Toledo</u>, 488 F. App'x 107, 113 (6th Cir. 2012) (exception does not apply to decedent who was "not incarcerated, institutionalized, or put under a similar restraint at the time that he killed himself.")

Here, it is undisputed that Decedent did not die while in Defendant County's custody.  Rather, he died three days later of environmental heat and sun exposure.  SUF 62-67.  As in *DeShaney*, Defendant had no duty to protect Decedent from harm once he was released from IRC custody.  Without such duty, there cannot be a constitutional violation.  Therefore, as a matter of law, Plaintiffs cannot prevail on a special relationship theory.

        **ii.    The state-created danger exception does not spply  because Defendant County had no notice or knowledge that releasing Decedent could cause him harm.**

The second exception created by *DeShaney* is the state-created danger exception.  To prevail under this exception, "the plaintiff must show that the state official participated in creating a dangerous condition, and acted with deliberate indifference to the known or obvious danger in subjecting the plaintiff to it.  Only if

17

the state official was deliberately indifferent does the analysis then proceed further to decide whether the conduct amounts to a constitutional violation." <u>L.W. v. Grubbs</u>, 92 F.3d 894, 900 (9th Cir. 1996).  This deliberate indifference standard requires that the defendant have "actual knowledge of, or willfully ignore, impending harm." <u>Id.</u>

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." <u>Patel</u>, 648 F.3d at 974 (quoting <i>Bryan Cnty. v. Brown,</i> 520 U.S. (1997) 397, 410).  It "is a higher standard than gross negligence because it requires a culpable mental state, meaning that the state actor must recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff." <u>Lewis</u>, 2011 WL 6288100, at *5 (quoting <u>Campbell v. State of Washington Dep't of Soc. & Health Servs.</u>, 671 F.3d 837 (9th Cir. 2011)).

Plaintiffs cannot prevail on this exception either because there is no evidence that Defendant County created a dangerous condition for Decedent or possessed any knowledge that releasing him could cause harm.  Rather, the evidence unequivocally shows that Defendant County was never informed that Decedent suffered from any type of physical or mental condition that would prevent his release.  SUF 78-101.  Had Plaintiffs communicated concern for Decedent's well-being to Defendant County prior to Decedent's release, Defendant County would have addressed those concerns.  Further, in the approximately 12 hours Decedent spent in IRC, he displayed no signs of physical or mental illnesses and was medically evaluated twice, wherein he denied any issues except for high blood pressure, which was addressed.  SUF 23-61.

As Defendant County had no notice or knowledge that Decedent may have had physical and/or mental health issues, it could not have acted with deliberate indifference in releasing him once his time in IRC was complete.  As Plaintiffs are

18

1  unable to prevail under either theory, Defendant County is entitled to judgment in

2  its favor as a matter of law.

3  **VI.   DEFENDANT COUNTY DID NOT HAVE A CUSTOM, POLICY, OR**

4  **PRACTICE THAT CAUSED ANY ALLEGED VIOLATION OF**

5  **DECEDENT'S RIGHTS.**

6  Even assuming arguendo that Plaintiffs could establish a requisite

7  constitutional violation, they cannot establish such violation was *caused* by

8  Defendant County's deficient customs, policies, or practices.

9  If a constitutional violation has been established, the first inquiry in a case

10  alleging municipal liability under 42 U.S.C.A. § 1983 is whether there is a direct

11  causal link between a municipal policy or custom and the alleged constitutional

12  violation.  Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1075 (9th Cir. 2016), cert.

13  denied sub nom. Los Angeles Cty., Cal. v. Castro, 137 S. Ct. 831, 197 L. Ed. 2d 69

14  (2017).  If a causal link exists, the second inquiry is whether the custom or policy

15  was adhered to with deliberate indifference to the constitutional rights of the

16  plaintiff.  Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1076 (9th Cir. 2016), cert.

17  denied sub nom. Los Angeles Cty., Cal. v. Castro, 137 S. Ct. 831, 197 L. Ed. 2d 69

18  (2017).

19  Absent a formal policy, a plaintiff must show a "longstanding practice or

20  custom" that is so "persistent and widespread," it constitutes a "permanent and well

21  settled city policy."  Trevino, 99 F.3d at 918.  "Liability for improper custom may

22  not be predicated on isolated or sporadic incidents; it must be founded upon

23  practices of sufficient duration, frequency and consistency that the conduct has

24  become a traditional method of carrying out policy."  *Id.*

25  Here, Plaintiffs have alleged that Defendant County, through the LASD, has

26  several policies, practices, and customs that prevented members of the public from

27  communicating concerns about inmates in LASD custody and lacked training and

28  policies with regards to treatment of inmates with mental illnesses.  Plaintiffs have

19

no admissible evidence that LASD or Defendant County maintained such policies or any policies and practices that violated Decedent's rights.   This is because, as demonstrated below, none of Plaintiffs' allegations are true.

      **A.**    **LASD Has Policies And Protocols In Place To Ensure Information About An Inmate's Physical Health, Mental Health, And/Or Need For Medication Is Received, Addressed, And Relayed To Healthcare Personnel In The Facility Where An Inmate Is Housed.**

As discussed in section II.E., the MCC provides a means for members of the public to speak to a supervising registered nurse 24 hours a day, seven days a week to convey any concerns regarding an inmate's physical health, mental health, and/or need for medication.  SUF 125.  The MCC Nurses assess the concern and convey the information to healthcare personnel in the facility where the inmate is located to ensure the inmate receives evaluation and care as needed.  SUF 126-129.  MCC's purpose and specific duties and requirements for MCC Nurses are set forth in Medical Services Bureau ("MSB") Policy M40.02.  SUF 128.

Inmate medical and mental health issues are not handled by IAS operators.  SUF 119.  IAS operators provide publicly-available information about specific inmates, such as their booking number, current housing location, arresting agency and offense, upcoming court dates, bail amounts, visiting information, release information, and booking information.  SUF 113.  IAS operators also provide callers general information, such as rules and regulations for sending inmates mail or providing them money, various phone numbers, visiting information for different facilities, and other publically available information.  SUF 114.  Contrary to Plaintiffs' allegations, IAS operators are never instructed to ignore the concerns of callers.  SUF 112.  Rather, they are instructed to carry out IAS' purpose to be helpful and provide information to the public relating to their loved ones who are in custody.  SUF 112.

IAS Operators are trained and instructed to provide callers with the fax and/or phone number for MCC if the caller indicates an inmate has medical or mental health issues.  SUF 109, 119-122.  Every IAS workstation has an IAS Guide for use by the IAS Operators.  SUF 110.  The IAS Guide contains information for the operators to convey to callers, as well as rules and regulations for the IAS operators and telephone procedures.  SUF 107.  Included in the IAS Guide is a medical and mental health guide that mirrors the step-by-step mental health guide provided on LASD's website.  SUF 107, 119.

All IAS operators are trained by an IAS supervisor before answering any phone calls.  SUF 109.  This training includes thoroughly reviewing the IAS Guide page-by-page, discussing what information should and should not be relayed to a caller, demonstrating how to answer calls, playing sample calls, and explaining what to do in certain scenarios.  SUF 109.  IAS operators are trained to use the IAS Guide when answering calls and to ask IAS supervisors if they are not sure what to do or need assistance.  SUF 109.  If an IAS operator has any questions or needs assistance, she simply raises her hand or says "inmate check" and the IAS supervisor will assist.  SUF 115.  From their workstations, IAS operators can transfer calls to the IAS supervisors.  SUF 116.  If required, IAS supervisors are able to transfer the call to IRC's watch commander or watch sergeant.  SUF 116.  IAS supervisors strive to provide meaningful supervision and assistance to the operators at all times.  SUF 117.

### B.     LASD Has Customs And Policies In Place To Ensure All Custody Personnel Are Extensively Trained In The Evaluation, Recognition, And Intervention Of Inmates With Mental Health Problems.

IRC has approximately 847 employees, including sworn deputies, custody assistants, and professional staff.  SUF 143.  All sworn deputies, custody assistants, and medical staff within IRC are trained in recognizing signs and symptoms of

21

mental illness and the procedures to follow when mental illness is identified or suspected.  SUF 109.

Beyond the training required to be a deputy or custody assistant, which includes specific mental health training, all deputies and custody assistants assigned to IRC must go through a three-day orientation upon arrival, followed by a twelve-week training course.  SUF 144-146.  The twelve-week training course is mandated and monitored by LASD's Custody Division, which is responsible for the operation of Los Angeles County's jail system and for the custody, security, rehabilitation, and care of all sentenced and pretrial inmates held in County facilities.  SUF 146.  Each trainee is assigned a training officer who teaches, guides, supervises, and evaluates the trainee for the twelve-week training.  SUF 146.

The training requires trainees to demonstrate a knowledge of all booking procedures, including but not limited to booking inmates with medical or behavioral issues, filing medical paperwork, and the medical screening triage process.  SUF 147.  Trainees must further demonstrate a knowledge of inmate classification in relation to the inmate's responses to medical questions and all IRC clinic procedures, to include further triage, how and when to complete a Mental Observation form, identification of mental health issues, and securing, housing, and/or transferring of inmates displaying signs of mental illness or distress.  SUF 147.

Following successful completion of this initial training, deputies and custody assistants must complete a minimum of 24 additional hours of custody-related training each year as required by the Standards and Training for Corrections ("STC"), pursuant to Title 15, section 1025.  SUF 148.  Custody Division provides STC certified classes to all custody personnel on a continual basis and monitors compliance.  SUF 148.  IRC also provides additional in-house training for IRC personnel.  SUF 148.  On average, deputies and custody assistants assigned to IRC conduct 40 hours of STC training each year, exceeding their yearly STC

requirement.  SUF 148.  At the time of this incident, IRC was at 100 percent compliance with STC standards.  SUF 148.

Healthcare personnel assigned to IRC attend a 14-day orientation upon first arrival where they are trained on the IRC workflows, screening new inmates in IRC for physical and mental health conditions, identifying physical and mental health issues and how to handle such issues appropriately, performing nursing assessments and how nurses refer patients for further physical or mental health evaluations by healthcare providers.  SUF 134.  Per policy, IRC nurses are also trained to assess needs and abilities of inmates through interview and observation at each level of health evaluation.  SUF 137.  This includes, but is not limited to, an objective assessment of a patient's general appearance, behavioral expression or affect, quality of speech, motor function and gait, as well an assessment of his or her physical health.  SUF 137.  Any abnormal findings are referred to a healthcare provider.  SUF 137.

MSB policies continue to instruct IRC healthcare personnel on the identification, documentation, and referral options for inmates with mental health issues.  SUF 138-140.  Per policy and practice, every newly booked inmate receives screening and evaluation for mental health and physical health problems when first booked into IRC, prior to housing in a Los Angeles County Jail facility.  SUF 135-136.  Inmates are not housed, nor are they released, until they are both medically and mentally cleared by trained healthcare staff.  SUF 135-136.  If an issue is identified by the healthcare staff or the inmate, the inmate is referred to a medical and/or mental health care provider for further evaluation and care.  SUF 136.  If an inmate is found unsuitable for booking due to a medical and/or mental health issue, he is taken to the Los Angeles County + University of Southern California (LAC + USC) Medical Center or to another acute care hospital for evaluation and treatment.  SUF 136.

23

Per policy, booking deputies and custody assistants must be familiar with the medical evaluation process, to include all required paperwork, referrals to a healthcare provider and/or transfer to an acute care center, and procedures when an inmate is medically refused admittance into IRC.  SUF 149.  Further, custody personnel are required to monitor inmates throughout the booking procedure for signs of medical/mental health concerns.  SUF 149.

**C.** **Defendant Does Not Have A Pattern And Practice Of Releasing Mentally Ill Inmates Without Regard To Their Wellbeing And Safety.**

Contrary to Plaintiffs' allegations, IRC has policies and practices in place for addressing newly-released inmates who require additional assistance to ensure their safety and care.  SUF 150-154.  IRC Unit Order 5-01/011.00 instructs personnel that is it the responsibility of all IRC personnel to assist inmates who have "additional needs" that are obvious or determined by healthcare personnel during release from custody.  SUF 154.  Inmates with "additional needs" include those suffering from Alzheimer's, Dementia, or "any other such condition that, without proper follow-up to the inmate's family member, social support structure, or referral to a qualified program, might lead to a harmful situation when released."  SUF 154.

IRC maintains an "Additional Needs Desk" for the purpose of coordinating with healthcare personnel the release of such an identified inmate to the appropriate person/facility.  SUF 154.  Personnel assigned to the release area are instructed to work with the Additional Needs Desk and follow any arrangements made by the Additional Needs Desk personnel.  SUF 154.

LASD also has protocols in place to protect inmates from being released alone at night if they do not wish to be released in such manner.  SUF 152.  Per Penal Code section 4024, LASD maintains a Voluntary Delayed Release program, which gives released inmates the opportunity to stay in custody up to 16 additional hours or until normal business hours if they so choose.  SUF 152.  Normal business hours are 7 a.m. through 5 p.m.  SUF 152.  An inmate can choose to stay in custody

24

for a number of reasons, including not wanting to be released during nighttime hours and not having transportation available.  SUF 152.  Prior to release, each inmate at IRC is presented with a Voluntary Delayed Release form and provided an explanation by a deputy of the option to stay.  SUF 152.

As demonstrated, LASD's policies, practices, and customs reflect a comprehensive system of receiving and relaying medical and/or mental health concerns from members of the public to the facility where an inmate is located, as well as training and practices to ensure mentally ill inmates are identified, receive treatment, and are not released under conditions that could be unsafe. As Plaintiffs are unable to demonstrate otherwise, they are unable to prevail at trial and Defendant is entitled to summary judgment as a matter of law.

## VII.   CONCLUSION

For the forgoing reasons, Defendants respectfully request this Court grant Defendants' Motion for Summary Judgment in favor of Defendant.

Dated: January 8, 2018              LAWRENCE BEACH ALLEN & CHOI, PC


By _____/s/ Emily B. Suhr_____
Emily B. Suhr
Attorneys for Defendant
COUNTY OF LOS ANGELES

25