JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALD SAKAMOTO, *by and through surviving heirs*; et al., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF LOS ANGELES, <br><br> Defendant. | CASE NO. CV 17-3181-R <br><br> ORDER GRANTING DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR SUMMARY JUDGMENT |

Before the Court is Defendant's Motion Summary Judgment, which was filed on January 8, 2018. (Dkt. No. 43). Having been thoroughly briefed by the parties, this Court took the matter under submission on February 14, 2018.

On February 15, 2017, Plaintiffs filed their Complaint against Defendant, the City of Los Angeles, the City of Pasadena, and the State of California. Defendant is the only remaining party to the action. The remaining claims under 42 U.S.C. § 1983 allege violations of Plaintiffs' Fourteenth Amendment rights and municipal liability under *Monell*. Defendant moves for summary judgment on the remaining claims.

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986). To meet its burden of production, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party meets its initial burden of showing there is no genuine issue of material fact, the opposing party has the burden of producing competent evidence and cannot rely on mere allegations or denials in the pleadings. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.*

**I. FACTS**

Decedent was arrested in the early morning hours of July 29, 2016, after driving northbound in the southbound lanes of I-5 near Pasadena. California Highway Patrol ("CHP") Officers Lee and Juarez stopped Decedent and conducted a felony stop. Juarez testified that during the stop, Decedent was cooperative and compliant with orders, did not display any signs indicating that he was a danger to himself or others, and did not appear confused or disoriented. Lee and Juarez then transferred Decedent to the custody of CHP Officer Sanchez. Juarez called Decedent's wife, Jane Sakamoto, between 2:00 and 3:00 A.M. to inform her that Decedent had been detained.

Plaintiffs dispute the content of the phone call between Juarez and Jane. Plaintiffs state that Jane informed him of Decedent's physical and mental illnesses, and Juarez states that he was not so informed. No matter the specific contents of the conversation, the undisputed evidence in the record shows that Juarez did not inform the Defendant that Decedent might have any physical or mental health issues.

Sanchez conducted a series of Field Sobriety Tests on Decedent, which he failed. Decedent told Sanchez that he was bipolar and he had taken Ativan and Ambien prior to driving his vehicle. Shortly after 3:00 A.M., Officer Sanchez arrested Decedent for driving while under the influence of drugs, and he transferred Decedent to the Los Angeles Sheriff's Department ("LASD") Inmate Reception Center ("IRC") for booking. At the IRC, Sanchez filled out booking

1  paperwork for Decedent.  He indicated on the Arrestee Medical Screening Form that Decedent
2  appeared to be under the influence of drugs, did not have any medical or mental health issues, and
3  was not taking any medication.  Sanchez did not complete the required Intoxication Assessment
4  Form.
5     Pursuant to policy, all newly booked inmates are screened for physical and/or mental
6  health issues prior to being housed in a Los Angeles County jail facility, including the IRC.  At
7  approximately 8:25 A.M., Nurse David Jung conducted Decedent's intake screening.  Inmates
8  who answer "yes" to any of the intake questions are referred for further evaluation, and if an
9  inmate is over 55, like Decedent, he is always referred for further evaluation and database entry.
10 Nurse Jung asked Decedent questions about his health.  He answered "yes" to having medical
11 problems and currently taking medication.  He answered "no" to current medical problems, history
12 of mental illness, and current mental health problems.  Nurse Jung indicated that Decedent did not
13 display "bizarre behavior" or signs of mental illness.  Nurse Jung noted that Decedent had high
14 blood pressure.  Decedent was referred for further evaluation.
15    Approximately four hours later, Nurse Cornelia Lindo conducted Decedent's second
16 evaluation and database entry.  Nurse Lindo had access to Decedent's Electronic Medical Record,
17 which only contained the Arrestee Medical Screening Form and Nurse Jung's intake screening.
18 Nurse Lindo asked Decedent questions regarding his mental and physical health and conducted a
19 full neurological assessment.  Nurse Lindo testified that Defendant appeared talkative, calm, and
20 friendly.  Decedent denied mental illness, and in Nurse Lindo's opinion, he did not display any
21 objective signs of mental illness.  Because Nurse Lindo did not observe any signs or symptoms of
22 mental or physical illness, she cleared Decedent to be released from the IRC without further
23 screening.  Plaintiffs dispute Nurse Lindo's testimony.  Plaintiffs note that the record of Nurse
24 Lindo's exam says "nuero [sic] assessment: problem."  This notation should have triggered
25 further, mandatory evaluation of Decedent.  Therefore, Plaintiffs dispute whether Nurse Lindo
26 properly cleared him for release.
27    Decedent was released from the IRC shortly after 7:00 P.M. on July 29, 2016.  Prior to
28 release from the IRC, inmates are directed to pick up their property from a cashier in the release

1  waiting area.  Two prominently displayed signs in the area advise inmates that they can request a
2  free token from the cashier for a bus ride.  The public waiting area outside of the release area
3  contains a bank of four pay phones that can be used by inmates just released.  Under the LASD
4  Voluntary Delayed Release ("VDR") program, inmates may stay in custody, if they choose, for up
5  to 16 hours or until normal business hours, which are 7:00 A.M. to 5:00 P.M.  Prior to release,
6  each inmate is provided with a VDR form and according to policy, a deputy explains the inmate's
7  option to stay.  The evidence shows that Decedent was presented with this form and signed and
8  indicated that he did not want to remain in custody.  Decedent retrieved his property, and he
9  walked out of the IRC at 7:47 P.M on July 29, 2016.  He did not make any phone calls.

10  Decedent's body was found at the Los Angeles City Maintenance Center on August 1,
11  2016.  The Center is not owned or operated by Defendant.  The Coroner determined that Decedent
12  died on August 1, 2016.  The cause of death was environmental heat and sun exposure with
13  contributing conditions including arteriosclerotic cardiovascular disease.

14  The LASD maintains a call center known as the Inmate Answering Service or Information
15  Answering Service ("IAS"), which provides callers with information about inmates housed in Los
16  Angeles County jail facilities.  Every call received by IAS is recorded.  The recordings are created
17  with VoicePrint software, which retains each recording for two years.  According to the IAS call
18  report, Jane called the IAS three times on July 29, 2016, to inquire about Decedent.  At 11:43
19  A.M., Jane placed the first call to the IAS.  IAS Operator Melvisa Rodell answered the call.  Jane
20  first asked to be transferred to the medical department.  Rodell asked for Decedent's booking
21  number, and after they identified Decedent, Jane told Rodell that she received a call from CHP
22  around 2:00 A.M. informing her that Decedent had been driving in the wrong direction on the
23  freeway, and she did not renew her request to speak with someone from the medical department.
24  Rodell informed Jane that Decedent was in custody at the IRC, that he would be released with a
25  citation in six to eight hours, and that Jane would have to wait for him to call her after he was
26  released.  Rodell then told Jane that Decedent had to be mentally and medically cleared before he
27  could be released.  Jane replied, "Okay.  So there's no bail then?"  Rodell then gave Jane the date,
28  time, and address of Decedent's October court appearance.  Rodell again told Jane, "He has to be

1  mentally and medically cleared before they will release him." Jane replied that she would wait for
2  his call. Rodell then informed Jane of the charges against Decedent. Jane replied that "he must
3  have been out of it because we don't usually go that way." Jane called the IAS again at 9:16 P.M.
4  and 9:33 P.M. The operator informed her that Decedent had been released at 7:36 P.M. and was
5  no longer in the custody of Los Angeles County.

6  Plaintiffs dispute the contents of these phone calls and question whether the call log and
7  transcripts are accurate. Plaintiffs assert that "there may be a missing recording or segment of
8  recording of Jane Sakamoto speaking with an IAS operator." Specifically, "Inmate operator
9  Melvalisa Rodell remembered Jane Sakamoto relaying medical information regarding decedent,
10 and Jane Sakamoto seems to remember same." Plaintiffs do not make an evidentiary objection.
11 The dispute is merely speculative, and Plaintiffs offer no reliable, competent evidence
12 demonstrating that there are missing portions of audio or that the transcripts are inaccurate.
13 Therefore, having reviewed the IAS call report and the transcription of the phone call, the Court
14 finds that there is no genuine dispute of fact that the call record and transcripts reflect all of Jane's
15 phone calls to the IAS.

16 **II.  DISCUSSION**

17 To establish § 1983 liability, "a plaintiff must show both (1) deprivation of a right secured
18 by the Constitution and laws of the United States, and (2) that the deprivation was committed by a
19 person acting under color of state law." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir.
20 2012). "[T]he general rule is that [a] state is not liable for its omissions." *Munger v. City of*
21 *Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000). There are two exceptions to this rule:
22 "(1) when a "special relationship" exists between the plaintiff and the state (the special-
23 relationship exception); and (2) when the state affirmatively places the plaintiff in danger by
24 acting with "deliberate indifference" to a "known or obvious danger" (the state-created danger
25 exception)." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971-72 (9th Cir. 2011). If either exception
26 applies, a state's omission or failure to protect may give rise to a § 1983 claim. *Id.* at 972. A
27 municipality can be found liable for § 1983 violations where the municipality itself causes the
28 violation. *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978).

The special-relationship exception applies when a state "takes a person into its custody and holds him there against his will." *Id.* Although incarceration triggers a constitutional duty of care, that duty ends when the person is no longer in state custody. *DeShaney*, 489 U.S. at 200. Under *DeShaney*, custody does not exist unless the state has restrained a person's liberty so that he cannot care for himself or ensure his own safety and well-being. *Id.* at 199. In *DeShaney*, the court held that there was no special relationship between the State and a physically abused child even though it "may have been aware of the dangers [the child faced] in the free world," because "it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. "That the State once took temporary custody of [the child] does not alter the analysis…the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *Id.*

Plaintiffs contend that, although Decedent was released from Defendant's physical custody, Decedent remained in legal custody because Defendant had exercised its power to deprive Decedent of his ability to care for himself by failing to offer him phone calls and releasing him without medication, money, or a phone into downtown Los Angeles. Therefore, Plaintiffs contend that there was a special relationship between Defendant and Decedent even after his release. The record contradicts this version of events.

First, Decedent was evaluated by two nurses, and both testified that Decedent did not display any behavior suggesting he was unable to care for himself. Both found Decedent to be in good general physical and mental health. They were unaware of his daily medication regimen or the potential consequences of him failing to take his medication. Therefore, the fact that he informed Nurse Jung he took medication for high blood pressure does not create a genuine dispute of fact as to whether he could care for himself—she was not informed that this medication, or any other medication, was critical to Decedent's mental and physical health. Likewise, the fact that the entry "neuro assessment: problem" did not trigger further evaluation, and that some necessary paperwork was not completed, does not contradict the evidence in the record that Decedent appeared completely able to care for himself. Moreover, video footage of Decedent in the IRC supports the nurses' conclusions. Decedent's behavior while waiting at the IRC was ordinary.

1 Despite Plaintiffs' contention that Decedent appeared "lost", "somewhat off-balance," and
2 "confused," the overwhelming evidence in the record shows that Decedent did not exhibit signs of
3 mental or physical illness while in custody.  *See Scott v. Harris*, 550 U.S. 372, 378-80 (holding
4 that when a video clearly contradicts one party's version of events, the court should not accept that
5 version).

6 Second, Defendant was never informed of Decedent's purported inability to care for
7 himself.  Even though Jane testified that she relayed medical information about Decedent to
8 Rodell, the undisputed facts, including a transcript of each of Jane's phone calls regarding
9 Decedent, show that she never communicated medical information about Decedent to any
10 operator.  Plaintiffs also state that Jane informed Juarez about Decedent's health problems.  But,
11 this fact is immaterial because, whether or not Juarez had additional information about Decedent's
12 health, he did not communicate that information to Defendant.  Therefore, Plaintiffs do not
13 genuine dispute that Defendant was unaware of Decedent's illnesses or purported inability to care
14 for himself.

15 Finally, Plaintiffs argue that Defendant deprived Decedent of his ability to care for himself
16 by releasing him without transportation, cash, or a phone.  Even though Defendant might have
17 been aware of the dangers a released inmate would face leaving the IRC without transportation,
18 cash, or a phone, this does not create special relationship under *DeShaney*.  The undisputed facts
19 show that Defendant did not create this danger, nor did it make Decedent more vulnerable to the
20 danger.  As stated above, "the State does not become the permanent guarantor of an individual's
21 safety by having once offered him shelter."  Therefore, the special-relationship exception does not
22 apply as a matter of law.

23 The state-created danger exception applies only where there is "affirmative conduct on the
24 part of the state in placing the [decedent] in danger," and the state acts with "deliberate
25 indifference" to a "known or obvious danger."  *Id.* at 974.  Deliberate indifference is "a stringent
26 standard of fault, requiring proof that a municipal actor disregarded a known or obvious
27 consequence of his action."  *Id.*  The state actor must "recognize an unreasonable risk and actually
28 intend to expose the [decedent] to such risks without regard to the consequences."  *Id.*

7

The state-created danger exception does not apply for many of the same reasons just articulated. Defendant had no reason to believe that Decedent was subject to an "unreasonable risk" when he was released from custody. Decedent did not exhibit any signs of physical or mental distress while in custody, and Defendant was never informed that Decedent suffered from any illnesses that posed an "unreasonable risk" to his health and safety. Therefore, Defendant could not have recognized an unreasonable risk to Defendant. Moreover, the fact that Defendant provided the Decedent with the opportunity to stay in custody through the VDR program contradicts a finding of "deliberate indifference." Under the program, an inmate may choose to stay in custody for a number of reasons, including not wanting to be released at nighttime, not having money, and not having transportation available. Plaintiffs attempt to dispute that Decedent was adequately informed about the VDR program or his ability to make phone calls, but they offer no reliable, competent evidence in support. The evidence shows that Defendant did not know of any risk that Decedent faced, and it even attempted to mitigate any unknown risk to Decedent through the VDR program. Therefore, there is no genuine dispute that Defendant did not act with "deliberate indifference" to a known or obvious danger to Decedent.

Because neither the special-relationship exception nor the state-created danger exception applies, Defendant cannot be held liable for its failure to protect Decedent. *Patel*, 648 F.3d at 971-72. Therefore, Plaintiffs' Fourteenth Amendment claims fail as a matter of law. A municipality is only liable under *Monell* if there has been a constitutional violation. Because there has been no constitutional violation, Plaintiffs' *Monell* claim also fails as a matter of law. *See DeShaney*, 489 U.S. at 202 n.10.

**IT IS HEREBY ORDERED THAT** Defendant County of Los Angeles's Motion for Summary Judgment is GRANTED. (Dkt. No. 43).

Dated: March 8, 2018.

_____

MANUEL L. REAL
UNITED STATES DISTRICT JUDGE